In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 24-2943

HAKEEM ABAYOMI,

*Plaintiff-Appellant,*

*v.*

DOUGLAS A. COLLINS,
Secretary, United States Department of Veterans Affairs,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-05661 — **John F. Kness**, *Judge.*

───────────────

ARGUED APRIL 23, 2025 — DECIDED JULY 16, 2026

───────────────

Before HAMILTON, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Hakeem Abayomi sued his former employer, the Department of Veterans Affairs, under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. §§ 2000e–2(a), 2000e–3(a). In his suit, Abayomi alleges he was fired based on his race and in retaliation for filing an internal discrimination complaint. The district court granted sum-

mary judgment for the Department as to both claims. We affirm.

**I**

We recount the facts in the light most favorable to Abayomi as the party opposing summary judgment. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1114 (7th Cir. 2022). Abayomi started working as a clinical pharmacist with the Department of Veterans Affairs in Hines, Illinois, on May 3, 2015. Abayomi was the only African American pharmacist at the Hines facility. As a pharmacist, Abayomi verified that medications prescribed by medical providers did not conflict with a patient's other medications, were set to an appropriate dosage, and contained correct labels. Abayomi, alongside other healthcare providers, was responsible for ensuring appropriate dosing schedules.

Once hired, Abayomi was on a yearlong probation.[1] During probation—as the termination letter Abayomi ultimately received explains—termination is required whenever an employee's "work performance or conduct fail[ed] to demonstrate fitness or qualifications for continued federal employment." Regardless of probationary status, the Department's policy permitted termination of any employee for making "a serious medication error that present[ed] a threat to patient safety," even on a first offense.

---

[1] Abayomi argues at length that he was not a probationary employee. As he explains it, his tenure classification exempted him from probation. But the record reflects that Department pharmacists could not avoid a probationary period upon hire. So, we proceed with Abayomi's argument in the alternative that he was in fact a probationary employee.

During Abayomi's employment, he had only one performance review, in November 2015. For that review, which assessed the first five months of his employment, he received a "fully successful" rating (the middle of five ratings) for every category. His overall rating was also "fully successful." Shortly after that review, Abayomi began reporting to Grant Elliot, supervisor of inpatient pharmacy. Elliot reported to Elizabeth Stone, associate chief of pharmacy, who in turn reported to Don Lynx, chief of pharmacy. In her position as associate chief of pharmacy, Stone was required to investigate serious medication errors made by pharmacists that were submitted through the Department's reporting system or that she learned of from a pharmacist's supervisor. She also was required to tell the chief of pharmacy if she learned of a medication error by a pharmacist under her supervision.

In February 2016, several months after Abayomi's performance review, Elliot spoke to him about his productivity and explained that it was too low. Within a few weeks, Elliot reported to Stone that Abayomi's productivity improved.

On March 7, 2016, approximately ten months into his year-long probation, Abayomi filed an Equal Employment Opportunity (EEO) complaint with the Department. The complaint accused his supervisor, Elliot, of "disparaging treatment and retaliation." In the complaint, Abayomi alleged that Elliot was, among other things, unfairly focusing on his performance, singling him out for counseling about low productivity, and unevenly handling his scheduling requests. Abayomi believed Elliot's treatment stemmed from Elliot's racial bias against him. Specifically, Abayomi alleged that, before Elliot became his supervisor, Elliot used a southern accent to call out "What's up, boy?" to him in a derogatory manner. Ac-

cording to another African American employee, Elliot had also tried to tell a "Black joke" and, on numerous occasions, imitated "Ebonics." The EEO program manager at the Hines facility informed Abayomi's supervisory chain—which included Elliot, Stone, and Lynx—of his complaint on March 15, and mediation was scheduled for April 20.

In early April, about a month after Abayomi's complaint, the Department started receiving anonymous reports by employees that Abayomi had made several medication errors. According to these reports:

- On April 8, Abayomi incorrectly dispensed 5,000 units per milliliter of heparin instead of 1,000 units per milliliter, as ordered.

- On April 11, Abayomi incorrectly verified a prescribed order of epoetin alfa at an unusually high dose.

- On April 12, Abayomi dispensed an insulin injector pen, in violation of the policy to dispense insulin in vial form.

- On April 13, Abayomi incorrectly verified an IV bag of heparin with an auxiliary label reading "High Alert Epinephrine."

On April 12, after the first two errors, Stone emailed the Department's labor relations specialist to inquire about Abayomi's probationary period. She followed up the next day by asking whether they should meet "to discuss the case for this employee since his probation period is coming up." The specialist added Lynx to the thread, responded that he was open to meet, but asked Stone if she had any "evidence." Regarding the timing of the request, the specialist stated: "[T]his is cut-

ting it pretty close, given that we had a whole year to evaluate probationary employee's conduct/performance and we are now 3 weeks short of May 3, 2016 [the end of Abayomi's probation]." In reply, Stone explained that the timing of her inquiry corresponded to the recency of Abayomi's medication errors. To this, the specialist reiterated that he should be sent "evidence asap (counselings, documents, policies, code of conduct/ethics, etc…)." He also expressed that "ideally, [i]t would have been helpful, if there was some type of documented remedial training as a result of these 2 events." At this point, Stone added Elliot to the email thread for Elliot to "supply the information" requested. The record does not state what information Elliot supplied in response to this request.

About a week later, on April 19, Stone met with Abayomi and his union representative to conduct a "Weingarten investigation." The Department uses *Weingarten* investigations (named after *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), which guaranteed the right to union representation at investigatory interviews) to examine incidents related to patient care, including medication errors. Because such investigations may result in discipline or termination, Department employees are entitled to union representation. At the investigatory interview, Abayomi denied committing the April 13 mislabeling, but admitted to the mistakes of April 8, April 11, and April 12.

The following day, on April 20, Abayomi participated in a mediation with Elliot to address his earlier EEO complaint. During the mediation, Elliot agreed to explore ways to improve Abayomi's schedule. Elliot later advised human resources that he did not want to be involved in personnel actions involving Abayomi to avoid disturbing the resolution of

the mediation and being accused of retaliation. Abayomi voluntarily withdrew his complaint that same day.

Nine days later, on April 29, the Department fired Abayomi. This was just four days shy of the end of Abayomi's probationary period. Lynx testified he was likely the final decisionmaker in terminating Abayomi, with Elliot and Stone playing a role in his decision-making "as a supervisor and an associate chief." The Department's termination letter cited Abayomi's "careless work performance" and failure to follow the facility's policy and procedures. It specifically referenced the April 8 and April 13 errors discussed at his *Weingarten* investigation.

After being terminated, Abayomi sued the Department, alleging race-based discrimination and retaliation under Title VII. The district court granted the Department's motion for summary judgment. The court found that Abayomi could not make a prima facie case of race discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), because he did not present evidence that he was treated less favorably than a similarly situated employee of a different race. And even if he had presented such evidence, the court concluded, Abayomi could not meet his burden of showing the Department's legitimate, nondiscriminatory reasons for firing him were pretextual. As for Abayomi's retaliation claim, the district court held that he failed to show a causal connection between his statutorily protected activity and his firing. Abayomi now appeals.

## II

We review the district court's grant of summary judgment de novo. *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 891 (7th Cir.

2024). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, to survive summary judgment, Abayomi must point to specific evidence that creates a genuine dispute for trial. *Johnson v. Accenture LLP*, 142 F.4th 536, 542 (7th Cir. 2025).

We begin with Abayomi's race-based discrimination claim before turning to his retaliation claim.

## A

Title VII prohibits an employer from discharging an employee because of his race, color, or national origin. 42 U.S.C. § 2000e–2. Here and before the district court, Abayomi presents his argument using the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas*. Under that approach, a plaintiff must present evidence that: (1) he is a member of a protected class; (2) he met his employer's legitimate work expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Lohmeier v. Gottlieb Mem'l Hosp.*, 147 F.4th 817, 825–26 (7th Cir. 2025). The burden then shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the employment action." *Id.* (citation modified). If the employer does so, the burden moves back to the plaintiff to rebut this reason as being pretextual. *Id.*

At its core, the purpose of the *McDonnell Douglas* framework is to facilitate the court's resolution of "the sole question that matters" in every Title VII discrimination case: "Whether a reasonable juror could conclude that [the plaintiff] would

have kept his job if he had a different ethnicity, and everything else had remained the same." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). With that purpose in mind, we have recognized that "[w]here a defendant offers a nondiscriminatory explanation for its employment decision, … '[t]he prima facie case and pretext inquiries often overlap.'" *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024) (alteration in original) (quoting *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011)). In such cases, "courts may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext." *Id.* (citation modified).

"Pretext is defined as 'a dishonest explanation, a lie rather than an oddity or an error.'" *Vassileva*, 118 F.4th at 874 (quoting *Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015)). When determining whether an employer's stated reason is pretextual, the question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (citation modified). "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (citation modified).

Here, the Department points to its termination letter as showing its reason for terminating Abayomi was nondiscriminatory. The letter stated that Abayomi was being terminated during his "probationary period because of careless work performance and failure to follow policy and/or procedures." The letter specifically pointed to the April 8 heparin dispen-

sation error and April 13 labeling error raised during the *Weingarten* investigation as evidence. The question for the purposes of our review, then, is whether Abayomi has met his burden of showing that this explanation was pretextual.

Before the district court and here on appeal, Abayomi disputes at length the accuracy of the *Weingarten* investigation's findings and the seriousness of the errors he committed. But "our court is not a superpersonnel department that reexamines an entity's business decisions." *Cunningham v. Austin*, 125 F.4th 783, 789 (7th Cir. 2025) (citation modified). And even if Abayomi's arguments were borne out by the record, "[t]o show pretext, a plaintiff 'must do more than simply allege that an employer's stated reasons are inaccurate; he must still have some circumstances to support an inference that there was an improper motivation proscribed by law.'" *Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020) (quoting *Benuzzi*, 647 F.3d at 663).

Abayomi's own admissions during the investigation make it difficult for a reasonable factfinder to conclude that the Department's rationale was a pretext to mask discriminatory animus. When asked about the April 8 heparin error, Abayomi admitted that he had dispensed the wrong amount because he "was rushing." As to the April 13 labeling error, he agreed that it was his responsibility as a pharmacist to verify the correct label was in place. But he declined to admit to making the error because he could not rule out the label "was slapped on" after his verification. And though the Department did not cite the remaining two errors in its letter, Abayomi admitted to making them, stating that it was "more than likely" that he had confirmed the wrong dose of epoetin alfa on April 11 and

that he was "for sure rushing" when he dispensed the insulin injector pen instead of doing so in vial form on April 12.

Abayomi makes an additional argument about pretext. He insists that the Department's treatment of four other "similarly situated" pharmacists who also made medication errors—Alex Chew (white), Heather Camren (white), Kam Li (Asian), and Patrick Hammond (white)—shows its reasons for terminating him were pretextual. Although typically evaluated as part of a prima facie under the *McDonnell Douglas* framework, "'comparator evidence and selective enforcement of an employer's rules' are relevant to a pretext analysis." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 894 (7th Cir. 2025) (quoting *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018); *see also Coleman v. Donahoe*, 667 F.3d 835, 857–58 (7th Cir. 2012) ("[T]he similarly-situated inquiry and the pretext inquiry are not hermetically sealed off from one another."). The purpose of the similarly situated analysis "is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Coleman*, 667 F.3d at 846 (citation modified). Though not a "magic formula," a plaintiff must typically show that the comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847 (citation modified).

Abayomi fails to provide evidence of the purported errors for the first three pharmacists, so those comparators fail. Accordingly, our inquiry focuses on the Department's treatment

of the fourth pharmacist, Patrick Hammond. Hammond joined the Hines facility as a pharmacist almost six months after Abayomi was terminated. Three months after Hammond completed his probationary period, a whistleblower complaint was filed with the Department's Office of the Medical Inspector (OMI), alleging that Hammond had a "history of serious errors in processing patient prescriptions resulting in comprised patient care." Ultimately the investigation substantiated some but not all of the whistleblower's allegations. Several months later, Hammond filed an EEO complaint against Hines alleging that he had been subjected to discrimination and a hostile work environment. The record does not state the outcome of this complaint, and Hammond resigned several months later for medical reasons.

In arguing that he and Hammond are similarly situated, Abayomi points to the difference in how Stone handled their respective medication errors. As Abayomi sees it, Stone was required to investigate any medication errors made by pharmacists in her reporting structure. Because several reports were made about Hammond's errors, Stone therefore was likely aware of Hammond's errors. Yet, Abayomi alleges, Stone deliberately chose not to subject Hammond to a *Weingarten* investigation.

Abayomi's argument fails for several reasons. First, the two did not share a common decision-maker. Abayomi reported to Elliot, who reported to Stone, who in turn reported to Lynx. It was Lynx who made the decision to fire Abayomi, the adverse employment action at issue here, which makes him the relevant decision-maker for the purposes of Abayomi's discrimination claim. *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) ("A decisionmaker is

the person responsible for the contested decision.") (citation modified). In contrast, by the time Hammond started working at Hines, Lynx had left the department.

Second, unlike Abayomi, Hammond was not a probationary employee when he made and was investigated for medication errors. *See Steinhauer v. DeGolier*, 359 F.3d 481, 484–85 (7th Cir. 2004) (finding two persons not similarly situated because of differences in probationary status and collecting cases holding the same).

Third, whereas Hammond contested and was cleared of most of his alleged errors, Abayomi admitted to committing three of the four alleged errors.

Fourth and finally, implicit in Abayomi's argument is the idea that a *Weingarten* investigation is more punitive than the investigation conducted by OMI. But Abayomi provides no evidence this is the case. Instead, the record demonstrates that a *Weingarten* investigation—that is, a conversation between the Department and an employee supported by a union representative—is the default action for any discussion with an employee that may involve discipline or termination. Although at summary judgment we view the record in the light most favorable to Abayomi as the non-movant, we cannot "fill in evidentiary holes with speculation." *Metzler v. Loyola Univ. Chicago*, 164 F.4th 612, 621 (7th Cir. 2026).

Because Abayomi provides no evidence of impermissible motivation behind the Department's decision to terminate his employment, his discrimination claim fails.[2]

---

[2] Abayomi also argues in his opening brief that "the racist comments by Elliot, who influenced the decision to terminate [him] by initiating the Weingarten investigation and later recommending termination to Lynx[,]

**B**

Under Title VII, an employer may not retaliate against an employee for opposing racially discriminatory employment practices. 42 U.S.C. § 2000e–3(a). For Abayomi's retaliation claim to survive summary judgment, he must present evidence from which a reasonable jury could find that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a but-for causal connection between the two. *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018). The protected activity need not be "the *only* cause of the adverse action." *Xiong v. Bd. of Regents of the Univ. of Wis. Sys.*, 62 F.4th 350, 355 (7th Cir. 2023) (citation omitted). Rather, the plaintiff must prove "that the adverse action would not have happened *without the activity*." *Id.* (citation omitted). Evidence relevant to this determination may include ambiguous statements of animus, comments directed at other employees in the protected group, evidence other employees were treated differently, evidence of pretext, and suspicious timing. *See, e.g.*, *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023); *Kidwell v. Eisenhauer*, 679 F.3d

---

are strong evidence of pretext." This could be interpreted as presenting a "cat's paw" theory of discrimination. *See Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014). But Abayomi does not cast his argument as such nor cite any caselaw on the theory. Therefore, the argument is waived. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Even if we were to solicitously construe Abayomi's papers as presenting a cat's-paw argument, Abayomi did not present this argument to the district court at summary judgment, which further supports waiver. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012).

957, 966 (7th Cir. 2012). We consider all the evidence "as a whole." *Ortiz*, 834 F.3d at 765.

For its part, the Department argues it could not have retaliated against Abayomi for filing an EEO complaint because he had already voluntarily withdrawn the complaint by the time the Department terminated him. But Abayomi's withdrawal of his complaint is immaterial for two reasons. First, it is the "filing of a charge" of discrimination that matters, not the date it was addressed or dismissed. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). Second, were we to adopt the Department's reasoning, employers would have a perverse incentive to intimidate their employees into withdrawing discrimination complaints because plaintiffs could no longer rely on withdrawn complaints as a basis for retaliation claims. As the Supreme Court has repeatedly recognized, "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from *making* or *supporting* a charge of discrimination.'" *Id.* (emphasis added) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In other words, the complaint need not be seen through to conclusion or found meritorious to qualify as a protected activity; a "sincerely and reasonably believed" complaint of discrimination suffices, *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

That the Department's argument conflicts with the purpose and operation of Title VII does not vindicate Abayomi's retaliation claim. The sticking point here is causation—whether the Department terminated Abayomi because of his EEO complaint. Abayomi makes two arguments that there was a causal connection: (1) the Department's reason for terminating him was pretextual and (2) there was a suspiciously

short time between when he filed his EEO complaint and when the *Weingarten* investigation began. For reasons we have already discussed, Abayomi's arguments about pretext are insufficient to vindicate his retaliation claim. His argument about the timing of his termination relative to the filing of his complaint also fails to carry the day.

Here, again, is the relevant timeline. Several months into his probation, Abayomi received a middle-of-the-road performance review and later improved the productivity issues Elliot had identified. Aside from this, there is no indication of performance issues before Abayomi's EEO complaint on March 7. Approximately one month later, on April 8, the Department began to receive the anonymous reports of Abayomi's medication errors. Discussion of these errors began on April 12, followed by the *Weingarten* investigation on April 19. The next day, Abayomi went through mediation for his EEO complaint and voluntarily withdrew the complaint that same day. He was then fired nine days later on April 29, four days before his probationary period ended.

By Abayomi's telling, this approximately two-month timeline from when he filed his EEO complaint to his termination supports an inference that availing himself of the complaint process marked him as a troublesome employee in the eyes of the Department, triggered the *Weingarten* investigation, and ultimately caused his termination. To Abayomi's credit, "we have 'rejected any bright-line rule about how close the events must be to establish causation.'" *Xiong*, 62 F.4th at 355 (quoting *Castro*, 786 F.3d at 565). Indeed, "in cases where there is 'corroborating evidence of retaliatory motive,' an 'interval of a few weeks or even months may provide probative evidence of the required causal nexus.'" *Castro*, 786 F.3d at 565

(quoting *Coleman*, 667 F.3d at 861). But Abayomi has provided no such corroborating evidence of a retaliatory motive to create a material dispute of fact about the Department's stated reason for his termination—that is, his medication errors, three of which he admitted to making.

### III

Considering the evidence both as a whole and in a light most favorable to Abayomi, we conclude there is insufficient evidence to support his claims of race-based discrimination and retaliation. For these reasons, the judgment of the district court is

AFFIRMED.